EXHIBIT 2

Trials@uspto.gov                                              Paper 13
571-272-7822                                    Entered:  November 30, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

ASML NETHERLANDS B.V., EXCELITAS TECHNOLOGIES CORP.,
and QIOPTIQ PHOTONICS GMBH & CO. KG,
Petitioner,

v.

ENERGETIQ TECHNOLOGY, INC.,
Patent Owner.
_____

Case IPR2015-01375
Patent 9,048,000 B2
_____

Before SALLY C. MEDLEY, JONI Y. CHANG, and
BARBARA A. PARVIS, *Administrative Patent Judges.*

CHANG, *Administrative Patent Judge.*

DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

# I.   INTRODUCTION

ASML Netherlands B.V., Excelitas Technologies Corp., and Qioptiq Photonics GmbH & Co. KG (collectively, "Petitioner") filed a Petition requesting an *inter partes* review of claims 1, 15, and 18 of U.S. Patent No. 9,048,000 B2 (Ex. 1001, "the '000 patent").  Paper 4 ("Pet.").  Energetiq Technology, Inc. ("Patent Owner") filed a Preliminary Response.  Paper 10 ("Prelim. Resp.").  We have jurisdiction under 35 U.S.C. § 314(a).

For the reasons set forth below, we institute an *inter partes* review as to claims 1, 15, and 18 of the '000 patent.

## A.  Related Matter

The parties indicate that the '000 patent is asserted in *Energetiq Technology, Inc. v. ASML Netherlands B.V.*, No. 1:15-cv-10240-LTS (D. Mass.), and identify related proceedings.  Pet. 1; Paper 11, 2–3.

## B.  The '000 Patent

The '000 patent claims under 35 U.S.C. § 120, through a series of continuation and continuation-in-part applications, the benefit of the filing date of an application filed March 31, 2006.  Ex. 1001, at [63]; Ex. 1002.  The '000 patent discloses a light source comprising a laser that ionizes a gas within a chamber to produce a plasma-generated light.  *Id*. at Abs.  According to the '000 patent, such a light source can be used as a source of illumination in a semiconductor photolithographic system.  *Id*. at 1:27–37.

IPR2015-01375
Patent 9,048,000 B2

Figure 1 of the '000 patent illustrates a block diagram of a light source, and is reproduced below with annotations added.



As shown in annotated Figure 1, light source 100 includes laser 104, chamber 128, and ignition source 140.  *Id*. at 14:40–16:5.  Laser 104 outputs laser beam 116 via fiber optic element 108.  *Id*.  Collimator 112 directs the laser beam to beam expander 118, which produces laser beam 122 and directs it to optical lens 120.  *Id*.  Optical lens 120 focuses the beam to produce smaller diameter laser beam 124 and directs it to region 130, where plasma 132 is generated along with emitting light 136.  *Id*.

## C.  Illustrative Claim

Claims 1 and 15 are independent, and claim 18 depends directly from claim 1, which is reproduced below.

1. A method for illuminating features of a semiconductor wafer, comprising:

ionizing a gas within a sealed pressurized plasma chamber having an operating pressure of at least 10 atmospheres;

providing *substantially continuous laser* energy having *a*

3

> *wavelength range of up to about 2000 nm* through a region of
> material of the sealed pressurized chamber that is transparent to
> the substantially continuous laser energy to the ionized gas to
> sustain a plasma within the sealed pressurized plasma chamber
> to produce plasma generated *light having wavelengths greater
> than 50 nm*; and

> illuminating the wafer with plasma-generated light having
> wavelengths greater than 50 nm that exits the sealed pressurized
> chamber.

Ex. 1001, 48:45–59 (emphases added).

### D. Prior Art Relied Upon

Petitioner relies upon the following prior art references[1]:

| | | | |
|---|---|---|---|
| Gärtner | FR 2554302 A1 | May 3, 1985 | (Ex. 1004) |
| Kensuke | JP 2006010675 A | Jan. 12, 2006 | (Ex. 1005) |
| Mourou | WO 2004/097520 A2 | Nov. 11, 2004 | (Ex. 1014) |

WILLIAM T. SILFVAST, LASER FUNDAMENTALS 1–6, 199–222, 565–68
(2d ed. 2004).  Ex. 1006 ("Silfvast").

---

[1] The citations to Gärtner and Kensuke in this Decision are to their certified
English-language translations in Exhibits 1004 and 1005, respectively.

*E. Asserted Grounds of Unpatentability*

Petitioner asserts the following grounds (Pet. 18, 42):

| Claims | Basis | References |
|--------|-------|------------|
| 1, 15, and 18 | § 103(a) | Gärtner in view of Mourou and Silfvast[2] |
| 1, 15, and 18 | § 103(a) | Gärtner in view of Kensuke and Silfvast |

## II.   ANALYSIS

*A. Claim Construction*

In an *inter partes* review, claim terms in an unexpired patent are given their broadest reasonable construction in light of the specification of the patent in which they appear.  37 C.F.R. § 42.100(b); *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1275–79 (Fed. Cir. 2015).  Here, Petitioner proposes construction for "light," which is recited in all of the challenged claims.  Pet. 8–11.  At this juncture, Patent Owner does not challenge Petitioner's proposed construction.  *See generally* Prelim. Resp.

Upon review of the present record, we determine that Petitioner's construction is consistent with the broadest reasonable construction.  For purposes of this Decision, we adopt the following claim construction:

---

[2] Silfvast is omitted inadvertently from each statement of the asserted grounds, although discussed in the Petitioner's analysis.  Pet. 14–18, 26–39, 45–54.  Therefore, we treat the statements of the asserted grounds as mere harmless error and presume that Petitioner intended to assert that the challenged claims are unpatentable based, in part, on Silfvast.

IPR2015-01375
Patent 9,048,000 B2

| Claim Term | Construction |
|---|---|
| light | electromagnetic radiation in the ultraviolet ("UV"), extreme UV, vacuum UV, visible, near infrared, middle infrared, or far infrared regions of the spectrum, having wavelengths within the range of 10 nm to 1,000 µm |

## B. Principles of Law

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc*., 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

## C. Obviousness

Petitioner asserts that claims 1, 15, and 18 are unpatentable under § 103(a) [3] as obvious over Gärtner in view of Mourou and Silfvast, and as obvious over Gärtner in view of Kensuke and Silfvast. Pet. 18–60. As

---

[3] Because, on this record, the effective filing date for the '000 patent is before March 16, 2013, the pre-Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011), version of § 103 applies.

support, Petitioner proffers a Declaration of Dr. J. Gary Eden, who has been retained as an expert witness for the instant proceeding.  Ex. 1003 ¶¶ 19–20.

Patent Owner counters that neither prior art combination renders claims 1, 15, and 18 obvious.  Prelim. Resp. 10–56.  In particular, Patent Owner argues that the combinations do not disclose "an operating pressure of at least 10 atmospheres," and "laser energy having a wavelength range of up to about 2000 nm."  *Id.*  Patent Owner also alleges that Petitioner fails to provide sufficient reasons to combine the prior art teachings.  *Id.*

In our discussion below, we begin with a brief summary of the cited prior art and then we address the parties' contentions in turn, focusing on the deficiencies alleged by Patent Owner.

### *1. Brief Summary of the Cited Prior Art*

<u>Gärtner</u>

Gärtner discloses a radiation light source for a photolithographic system, illuminating a photoresist layer on a semiconductor wafer. Ex. 1004, 1:1–4.  Figure 1 of Gärtner is reproduced below with annotations added.

IPR2015-01375
Patent 9,048,000 B2



As shown in annotated Figure 1 of Gärtner, Gärtner's light source includes continuous $CO_2$ laser 9, laser 10 (an ignition source), and chamber 1.  *Id*. at 4:31–5:12.  Plasma 14 is generated inside chamber 1 and emits light 15 into a downstream optical system through window 8.  *Id*.

Mourou

Mourou discloses a light source for semiconductor photolithography. Ex. 1014 ¶ 1.  Mourou's light source includes a titanium sapphire laser for providing energy with a wavelength of 800 nm.  *Id*. ¶ 22.

Kensuke

Kensuke discloses a light source that provides a continuous spectrum in the UV range.  Ex. 1005, Abs.  Kensuke's light source includes a titanium sapphire laser that generates energy having a wavelength range of about 500 to 1,100 nm.  *Id*. ¶ 14.

IPR2015-01375
Patent 9,048,000 B2

<u>Silfvast</u>

Silfvast is a book on laser fundamentals.  Ex. 1006, 1.  Silfvast states
that titanium sapphire lasers "can be operated over a wavelength range of
660–1,180 nm and thus has the broadest gain bandwidth of any laser."  *Id.* at
565.  According to Silfvast, "[c]ommercial titanium sapphire lasers are . . .
typically pumped with either argon ion lasers (for [continuous wave]
operation) or frequency-doubled Nd:YAG or Nd:YLF lasers (for pulsed
operation)."  *Id.*

*2.  Discussion*

<u>Pressure of 10 atmospheres or greater</u>

Claim 1 recites "a sealed pressurized plasma chamber having an
operating pressure of at least 10 atmospheres."  Ex. 1001, 48:47–48.
Claims 15 and 18 each recite "the pressure of the plasma chamber during
operation is greater than 10 atmospheres."  *Id.* at 49:48–49, 50:11–13.

Petitioner takes the position that Gärtner in combination with Mourou
and Silfvast, or with Kensuke and Silfvast, renders these limitations obvious.
Pet. 23–26, 44.  As support, Petitioner directs our attention to Gärtner's
disclosure of a gas-tight chamber containing a discharge medium, and an
example in which an argon or xenon is the "active medium with a working
pressure of $10^6$ Pa."  *Id.* at 24 (citing Ex. 1004, 4:32, 5:15–16, Fig. 1).

Patent Owner counters that "Gärtner fails to disclose an operating
pressure of at least 10 atmospheres."  Prelim. Resp. 10–12.  In particular,
Patent Owner argues that Gärtner's example describes a "pressure of $10^6$ Pa,

9

IPR2015-01375
Patent 9,048,000 B2

which is about 9.869 atm (at 1 Pascal = 0.00000986923267 atm) and therefore fails to fall with the claimed range." *Id*. at 10–11.

A pressure of $10^6$ Pascal is equivalent to 10 atmospheres, however, if the number is rounded mathematically to a whole number. Gärtner discloses a specific pressure as a whole number. The Specification of the '000 patent also discloses the pressure ranges in whole numbers—e.g., "the chamber . . . sustaining pressures between 10 to about 200 atmospheres"—and each of the claimed ranges is recited in whole numbers. Ex. 1001, 17:9–11, 48:45–46. On this record, we discern no meaningful difference between $10^6$ Pascal and 10 atmospheres in the context of the '000 patent. Thus, we determine that Petitioner has demonstrated sufficiently, for purposes of this Decision, that Gärtner discloses "a sealed pressurized plasma chamber having an operating pressure of at least 10 atmospheres," as recited in claim 1.

Patent Owner further argues that Gärtner "merely describes the phenomena by which temperature, pressure, and electromagnetic radiation can depend on one another in a particular system," and it does not disclose or suggest the claimed ranges. Prelim. Resp. 11–12. It is well-established, however, that "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *In re Boesch*, 617 F.2d 272, 276 (CCPA 1980); *In re Antonie*, 559 F.2d 618, 620 (CCPA 1977). "A recognition in the prior art that a property is affected by the variable is sufficient to find the variable result effective." *In re Applied Materials, Inc.*, 692 F.3d 1289, 1297 (Fed. Cir. 2012).

IPR2015-01375
Patent 9,048,000 B2

Here, immediately after teaching a specific example of using an argon or xenon atmosphere with a pressure of $10^6$ Pa, Gärtner discloses that "[t]he optical depth . . . can be varied with a vast range by *altering the pressure*," and "[a]s the *pressure increases*, . . . *the spectral distribution approaches Planck's function*." Ex. 1004, 5:15–19 (emphases added). Dr. Eden testifies that any light source emitting light having a spectrum that obeys Planck's function is known as a "blackbody" source—"an optical source that loses (emits) as much energy as it absorbs." Ex. 1003 ¶ 67. Dr. Eden further explains that, in such a light source, "[i]ncreasing the pressure results in the light source absorbing more power, and emitting more power." *Id.* According to Dr. Eden, an ordinarily skilled artisan would have recognized that increasing the pressure inside the plasma chamber of a light source will increase the brightness of the plasma-generated light.[4] Ex. 1003 ¶¶ 66–67; Ex. 1004, 5:16–19. In short, the pressure within the plasma chamber of a light source is a result effective variable.

Moreover, Dr. Eden testifies that "it would have been obvious to use Gärtner's teaching of varying the pressure and/or the knowledge of a person of skill in the art to increase the pressure to above 10 atmospheres," because sustaining plasmas in chambers with such a pressure was a matter of routine

---

[4] Petitioner asserts that one with ordinary skill in the art would have had a Ph.D. in physics, electrical engineering, or an equivalent field, and 2–4 years of work experience with lasers and plasma, or a master's degree in physics, electrical engineering, or an equivalent field, and 4–5 years of work experience with lasers and plasma. Pet. 3; Ex. 1003 ¶ 23. At this juncture, Patent Owner does not challenge this assertion. *See generally* Prelim. Resp.

IPR2015-01375
Patent 9,048,000 B2

skill.  Ex. 1003 ¶ 68, citing Ex. 1017, 177 ("laser-sustained plasmas have been operated in a variety of molecular and rare gases at pressures from 1 to more than 200 atm.").[5]  We credit Dr. Eden's testimony as it is supported by other evidence in this record.  At this juncture, Patent Owner does not allege that the claimed ranges are critical or "produce a new and unexpected result which is different in kind and not merely in degree from the results of the prior art."  *In re Aller*, 220 F.2d 454, 456 (CCPA 1955).

For the foregoing reasons, we determine that Petitioner has demonstrated sufficiently, for purposes of this Decision, that a combination based, in part, on Gärtner teaches or suggests a plasma chamber having a pressure of greater than 10 atmospheres, as recited in claims 15 and 18.

Laser energy having a wavelength of up to about 2000 nm

Claim 1 recites "providing substantially continuous laser energy having a wavelength range of up to about 2000 nm . . . to produce a plasma-generated light having wavelengths greater than 50 nm."  Ex. 1001, 48:49–55.  By virtue of its dependency, claim 18 also requires this limitation.  *Id*. at 50:12–14.  Independent claim 15 recites a similar limitation, but does not require the laser energy to be "substantially continuous."  *Id*. at 49:50–50:3.

Petitioner asserts that Gärtner in view of Mourou and Silfvast, or in view of Kensuke and Silfvast, renders the aforementioned limitation

---

[5] Dennis R. Keefer, *Laser-Sustained Plasma*, *in* LASER-INDUCED PLASMAS AND APPLICATIONS 169–206 (Leon J. Radziemski & David A. Cremers eds., 1989).  Ex. 1017 ("Keefer").

obvious.  Pet. 26–28, 44–46.  In particular, Petitioner alleges that Gärtner discloses a light source comprising a continuous $CO_2$ laser for ionizing a gas within a chamber to sustain a plasma, which produces a UV light having wavelengths greater than 50 nm.  *Id*.; Ex. 1004, 4:31–5:12.  Petitioner acknowledges that Gärtner does not disclose a "laser energy having a wavelength range of up to above 2000 nm," as recited in claims 1 and 15. Pet. 28, 46–47.  Nevertheless, Petitioner contends that lasers having energy with shorter wavelengths were well-known in the art because Mourou, Kensuke, and Silfvast each disclose a titanium sapphire laser that generates energy having a wavelength, or a range, falling squarely within the claimed range.  *Id*. at 26–39, 44–54; Ex. 1005 ¶ 14 (500 to 1,100 nm); Ex. 1006, 565–66 (660–1,180 nm); Ex. 1014 ¶ 22 (800 nm).  Petitioner further maintains that it would have been obvious to substitute a titanium sapphire laser for Gärtner's continuous $CO_2$ laser, in view of Mourou and Silfvast, or in view of Kensuke and Silfvast.  Pet. at 26–39, 44–54.

Patent Owner disagrees and advances two arguments.  Prelim. Resp. 12–42, 43–56.  First, Patent Owner argues that neither Mourou nor Kensuke discloses a *continuous* laser or a laser that provides substantially *continuous* energy.  *Id*. at 9, 22–26, 42, 44–46.

It was known in the art at the time of the invention, however, that "[c]ommercial titanium sapphire lasers are . . . typically pumped with either argon ion laser (for [*continuous wave*] operation) or frequency-doubled Nd:YAG or ND:YLF lasers (for pulsed operation)," as described by Silfvast. Ex. 1006, 565–66 (emphasis added).  Therefore, one with ordinary skill in

the art would have understood that a titanium sapphire laser having a *continuous wave* operation (hereafter "a continuous titanium sapphire laser") was commercially available at the time of the invention.  Dr. Eden testifies that such an artisan would have utilized a continuous titanium sapphire laser in Gärtner's light source "to achieve a 100% duty cycle which, in turn, provides uninterrupted power to the plasma light source," so that "the plasma would provide a continuous output of light," which is desirable for semiconductor photolithography.  Ex. 1003 ¶¶ 74, 108.  On this record, we credit Dr. Eden's testimony as it is consistent with the prior art of record.

Second, Patent Owner argues that the prior art combinations would not generate a light having wavelengths greater than 50 nm.  Prelim. Resp. 12–26, 42–46.  In particular, Patent Owner contends that substituting Gärtner's $CO_2$ laser with a titanium sapphire laser would change Gärtner's principle of operation and require undue experimentation, completely redesigning Gärtner's system.  *Id*. at 16–18, 42–46 (citing *In re Ratti*, 270 F.2d 810, 813 (CCPA 1959)).  Patent Owner also alleges that Mourou's laser generates *extreme* UV light in water droplets, and it would have been too hot and provide too much power to sustain the *extreme* UV light.  *Id*. at 13–22.

Patent Owner's contentions, however, are premised on the notion that the prior art combinations would have required reconfiguring Gärtner's *continuous* $CO_2$ laser to a *pulsed* titanium sapphire laser, and then reconfiguring the *pulsed* laser to a *continuous* laser.  *Id*. at 16–18, 42–46.  As discussed above, *continuous* titanium sapphire lasers were commercially available at the time of the invention.  Ex. 1006, 565.  Patent Owner does not

14

IPR2015-01375
Patent 9,048,000 B2

provide sufficient or credible evidence that a simple substitution of a
*continuous* titanium sapphire laser for Gärtner's *continuous* $CO_2$ laser would
be "uniquely challenging or difficult for one of ordinary skill in the art." *See*
*Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed.
Cir. 2007).

Patent Owner also fails to consider the prior art in the context of the
knowledge that a person of ordinary skill in the art would have had with
respect to light sources. *See Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed.
Cir. 2013). The level of ordinary skill in the art is reflected by the prior art
of record. *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).
Here, Mourou illustrates that it was already known in the art to utilize a
titanium sapphire laser in a light source to produce a plasma-generated light
for semiconductor photolithography. Ex. 1014 ¶¶ 1, 9, 22. Gärtner teaches
that a desired wavelength range for such a light is in the UV region—
wavelengths greater than 50 nm. Ex. 1004, 2:28–30, 3:1–18, 4:34–5:1.
Moreover, Dr. Eden testifies that an ordinarily skilled artisan would have
understood that "laser sustained plasma produces light with a broad
spectrum of wavelengths, with the peak of the spectrum depending on the
power of the laser," and such an artisan would have adjusted the power to
maintain Gärtner's desired UV wavelength. Ex. 1003 ¶ 75. In fact, Silfvast
states that titanium sapphire lasers are the most widely used tunable
solid-state lasers. Ex. 1006, 565. And Kensuke discloses a light source
having a titanium sapphire laser to ionize a gas for generating a UV light
(Ex. 1005 ¶¶ 2–3, 14), showing that it is not beyond the skill of an artisan to

15

IPR2015-01375
Patent 9,048,000 B2

utilize a titanium sapphire laser in a light source to produce a UV plasma-generated light. *See KSR*, 550 U.S. at 417 ("[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill."); *see also id.* at 420 ("The second error of the Court of Appeals lay in its assumption that a person of ordinary skill attempting to solve a problem will be led only to those elements of prior art designed to solve the same problem.").

Patent Owner's reliance on *Ratti* is misplaced here. Gärtner's principle of operation is utilizing a laser to ionize a gas within a chamber for sustaining a plasma to produce a light. Ex. 1004, 4:31–5:12. Patent Owner does not provide sufficient or credible evidence that substituting a *continuous* titanium sapphire laser for Gärtner's *continuous* $CO_2$ laser would change that principle of operation. Indeed, Gärtner's light source, as modified, would have operated on the same principle as before, producing a plasma-generated light using a continuous laser to ionize the gas in a chamber. *See In re Umbarger*, 407 F.2d 425, 430–31 (CCPA 1969) (finding *Ratti* inapplicable where the modified apparatus will operate "on the same principles as before").

We also are not persuaded by Patent Owner's argument that Mourou discloses using a titanium sapphire laser to produce an *extreme UV* light, and not a *UV* light (Prelim. Resp. 12–22). Patent Owner attempts to limit Mourou's teachings narrowly to the particular examples disclosed in the

16

reference.  In an obviousness analysis, a reference may be relied upon for all that it would have suggested reasonably to one having ordinary skill in the art.  *Merck & Co., Inc. v. Biocraft Labs., Inc.*, 874 F.2d 804, 807 (Fed. Cir. 1989).  The disclosure of a reference is not limited to the specific examples contained in its disclosure.  *In re Mills*, 470 F.2d 649, 651 (CCPA 1972).

Based on the evidence before us, we determine that Petitioner has demonstrated sufficiently, for purposes of this Decision, that Gärtner in view of Mourou and Silfvast, or in view of Kensuke and Silfvast, discloses "providing substantially continuous laser energy having a wavelength range of up to about 2000 nm . . . to produce a plasma-generated light having wavelengths greater than 50 nm," as required by claims 1, 15, and 18.

Rationale to combine the prior art teachings

Patent Owner contends that Petitioner fails to articulate sufficient reasons to combine Gärtner with Mourou and Silfvast, and to combine Gärtner with Kensuke and Silfvast.  Prelim. Resp. 12–56.  Patent Owner also takes the position that the prior art in this record teaches away from replacing Gärtner's continuous $CO_2$ laser with a shorter wavelength laser, such as those disclosed in Mourou, Kensuke, and Silfvast.  *Id.* at 26–42, 46–48.  To substantiate its contentions, Patent Owner alleges that Cross[6],

---

[6] U.S. Patent No. 4,780,608, issued Oct. 25, 1988.  Ex. 1015 ("Cross").

IPR2015-01375
Patent 9,048,000 B2

Keefer, and Cremers[7] would have discouraged an artisan from using shorter wavelength lasers. *Id.*

In an obviousness analysis, prior art must be read in context, taking account of the knowledge possessed by one with ordinary skill in the art *at the time of the invention*. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1259–1262 (Fed. Cir. 2007). Here, the earliest filing date claimed by the '000 patent is *March 31, 2006*. Ex. 1001 at [63]. Yet, Patent Owner relies upon Cross, Keefer, and Cremers, which were *published in 1988, 1989, and 1985*, respectively. Those references, at best, show merely the knowledge of an artisan *in the 1980s*. Such evidence does not support Patent Owner's contentions, as it does not account for the technological advancements in the relevant art *between 1989 and 2006*.

As Petitioner points out, laser technology for shorter wavelengths improved significantly during the 1990s and early 2000s because of the development of the titanium-doped sapphire and rare earth-doped glass fiber lasers, making it easier and more desirable to sustain plasmas with shorter wavelength lasers. Pet. 14–18; Ex. 1003 ¶¶ 42–49; Ex. 1006, 567; Ex. 1022, 148.[8] More importantly, by 2004, shorter wavelength lasers had several known advantages—e.g., producing energy that can be carried by

--------------------

[7] David A. Cremers et al., *Evaluation of the Continuous Optical Discharge for Spectrochemical Analysis*, in SPECTROCHIMICA ACTA, Vol. 40B, No. 4, at 665–79 (1985). Ex. 2002 ("Cremers").

[8] RARE-EARTH-DOPED FIBER LASERS AND AMPLIFIERS 144–170 (Michel J.F. Digonnet ed., 2nd ed. 2001). Ex. 1022.

quartz optical fibers for long distances and can travel through glass, so that "high-quality glass lenses can be used to focus the beam down to a minimum spot size." Ex. 1016, 1601.[9] Dr. Eden testifies that shorter wavelength lasers also were considerably smaller and more efficient than $CO_2$ lasers. Ex. 1003 ¶ 46. Dr. Eden further testifies that substituting Gärtner's continuous $CO_2$ laser with a shorter wavelength laser would have required nothing more than routine skill, and a person with ordinary skill in the art would have had a reasonable expectation of success. *Id*. ¶¶ 86–87, 117–18. Indeed, as indicated in Silfvast (which was published in 2004), titanium sapphire lasers were commercially available and the most widely used tunable solid-state lasers. Ex. 1006, 565. On this record, we credit Dr. Eden's testimony as it is consistent with the prior art disclosures.

Patent Owner's assertion that an artisan would not have looked to Mourou because the considerations that affect *extreme UV* sources are different than that of *UV* sources (Prelim. Resp. 12–22) also is unavailing. Patent Owner again limits Mourou's teachings narrowly to the particular examples discussed in the reference. Significantly, Mourou, which discloses a light source comprising a shorter wavelength laser, is analogous art in that it is from the same field of endeavor as the '000 patent—namely, light sources. *See In re Clay*, 996 F.2d 656, 658–59 (Fed. Cir. 1992). Given the advantages of using shorter wavelength lasers, an ordinarily skilled artisan would have looked to Mourou to improve Gärtner's light source.

---

[9] HANDBOOK OF LASER TECHNOLOGY AND APPLICATIONS 1587–1611 (Colin E. Webb & Julian D.C. Jones eds., 2004). Ex. 1016.

IPR2015-01375
Patent 9,048,000 B2

Upon consideration of the evidence in the present record, we are persuaded by Petitioner's explanations and supporting evidence that merely substituting Gärtner's continuous $CO_2$ laser with a continuous titanium sapphire laser that generates energy having shorter wavelengths, in view of Mourou and Silfvast, or in view of Kensuke and Silfvast, for sustaining a plasma to produce a UV light is no more than a predictable use of prior art elements according to their established functions—an obvious improvement. *See KSR*, 550 U.S. at 417. On this record, we determine that Petitioner has articulated sufficient reasons to combine Gärtner with Mourou and Silfvast, and to combine Gärtner with Kensuke and Silfvast.

Conclusion

For the foregoing reasons, we determine that Petitioner has demonstrated a reasonable likelihood of prevailing on its assertions that claims 1, 15, and 18 are unpatentable over Gärtner in view of Mourou and Silfvast, and over Gärtner in view of Kensuke and Silfvast.

### D. Other Considerations

Patent Owner urges the Board to deny one of the two asserted grounds of unpatentability "because the Petition presents multiple grounds in a redundant manner and makes no meaningful distinction between them." Prelim. Resp. 56–58. We are cognizant that, under 37 C.F.R. § 42.108(a), the Board has the discretion to deny one or more grounds as being redundant to an instituted ground. The Board, however, is not required to exercise its discretion in every proceeding. Here, we observe that Petitioner asserts only two grounds, both of which involve the same base reference and challenge

20

IPR2015-01375
Patent 9,048,000 B2

the same three claims.  As discussed above, we determine that, for each asserted ground, Petitioner has demonstrated a reasonable likelihood of prevailing.  Given the particular facts of this proceeding, we decline to exercise our discretion to deny either ground.

## III.  CONCLUSION

For the foregoing reasons, we determine that there is a reasonable likelihood that Petitioner would prevail in challenging claims 1, 15, and 18. We, however, have not made a final determination as to the patentability of the challenged claims, nor with respect to claim construction.

## IV.  ORDER

For the foregoing reasons, it is

ORDERED that pursuant to 35 U.S.C. § 314(a), an *inter partes* review is hereby instituted for the following grounds of unpatentability:

| Claims | Basis | References |
|--------|-------|------------|
| 1, 15, and 18 | § 103(a) | Gärtner in view of Mourou and Silfvast |
| 1, 15, and 18 | § 103(a) | Gärtner in view of Kensuke and Silfvast |

FURTHER ORDERED that no other ground of unpatentability asserted in the Petition is authorized for this *inter partes* review; and

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial; the trial will commence on the entry date of this decision.

21

IPR2015-01375
Patent 9,048,000 B2


PETITIONER:

Donald R. Steinberg
David L. Cavanaugh
Michael H. Smith

Wilmer Cutler Pickering Hale & Dorr LLP

Don.Steinberg@wilmerhale.com
David.Cavanaugh@wilmerhale.com
MichaelH.Smith@wilmerhale.com


PATENT OWNER:

Steven M. Bauer
Joseph A. Capraro Jr.

Proskauer Rose LLP

PTABMattersBoston@proskauer.com
JCapraro@proskauer.com